IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

CONSTRUCTION INDUSTRY LABORERS )
PENSION FUND, et al., )
 )
       Plaintiffs, )
 ) Case No. 05-4058-CV-C-NKL
v. )
 )
AUGERS UNLIMITED, INC., )
 )
       Defendant. )
 )

ORDER

Pending before the Court are Plaintiffs' Motion for Summary Judgment [Doc. # 25] and Defendant's Motion for Summary Judgment [Doc. # 26]. For the reasons set forth below, Plaintiffs' Motion is granted and Defendant's Motion is denied.

**I.     Factual Background**

The parties have jointly stipulated to the following facts [Doc. # 24]. In 1994, the Heavy Construction Laborers Locals No. 1290 and 663 of Western Missouri ("the Union") and the Heavy Constructors' Association of the Greater Kansas City Area signed a Collective Bargaining Agreement ("the CBA"). Effective March 31, 1998, the parties to the 1994 CBA signed a new CBA to last until 2002. Its termination clause was identical to the one in the 1994 CBA, except for new dates.

1

Defendant Augers Unlimited ("Augers") was not a signatory to either the 1994 or 1998 CBA; however, by and through its President, Patrick Griffith ("Griffith"), Augers signed a Short-Form Agreement (the "Short Form") with the Union, on August 24, 1998. This Short Form bound Augers to the terms of the CBA,[1] and thereby obligated Augers to make certain payments to the Construction Industry Laborers Pension Fund, the Construction Industry Laborers Welfare Fund, the Construction Industry Laborers Vacation Fund, and the Construction Industry Laborers Training Fund (collectively "the Funds") for the duration of the agreement. This suit was filed by the Plaintiff Funds to collect the payments which they claim are now due under the contract.

Augers' defense is that it terminated its agreement with the Union when Augers, on January 27, 2003, sent a letter to the Funds' Administrator C. Frank Taggart ("Taggart"), at 116 Commerce Drive, Jefferson City, Missouri, stating Augers' intention to terminate its agreement with the Union effective March 31, 2003. The letter was forwarded to Funds' counsel, Michael Newbold ("Newbold"), who, on February 10, 2003, sent a letter to Mark

---

[1] It is not clear whether the Short Form obligated Augers to the 1994-1998 CBA or the 1998-2002 CBA. The Short Form references the 1994-1998 CBA, but the Funds contend that this was a typographical error because the 1994-1998 CBA had already expired and was superseded by the 1998-2002 CBA. By contrast, Augers argues that the Short Form is unambiguous in its reference to the 1994-1998 CBA. Nonetheless, Augers concedes that both agreements, 1994-1998 and 1998-2002, have identical termination clauses except for their dates, and acknowledges that Augers was bound to one of the CBAs. It is, therefore, unnecessary to determine which CBA is applicable, because that dispute is only material to whether the notice was timely, i.e., whether the window for giving notice of termination opened every year or every four years. Because the Court found that notice was given to the wrong party, it is not necessary to consider whether the notice was timely.

Nidiffer and Jeffrey Wilkinson, in their capacity as Fund trustees,[2] to inform them that Augers had attempted to terminate its obligation but that Newbold believed the termination was untimely and improper. Taggart told Newbold to alert Augers to the fact that it had notified the wrong party, but Newbold did not do so. Without ever learning that the Funds did not consider the CBA terminated, Augers stopped making contributions in April 2003.

In October 2003, the Union sued Augers for prior unpaid contributions. That suit was eventually settled by the parties but, subsequently, the Funds sought another audit of Augers' books to determine what additional payments were due after October 2003. When Augers' counsel wrote Newbold, stating that Augers didn't owe any further contributions because its agreement with the Union had been terminated in 2003, Newbold responded by informing Augers, for the first time in February 2005, that the Union had never received notice of termination of the agreement, and, thus, the Funds considered the agreement still in effect.

The termination clause in both the 1994 and 1998 CBA provided that:

The provisions and rates of this Agreement shall be effective when executed and will remain in force and effect until March 31, 1998 [2002],[3] and thereafter from year to year unless written notice is sent by registered mail, given by one of the parties hereto, to the other party hereto, sixty (60) days in advance of March 31, 1998 [2002], or March 31 of any succeeding year if said parties desire to amend or abrogate this Agreement. If either party gives notice of its desire to terminate this Agreement in the manner herein set out sixty (60) days prior to March 31, 1998 [2002], all obligations under this

---

[2]Nidiffer and Wilkinson were also members of the Union, but there is no evidence that they notified the Union of the termination letter or that they received the letter from Newbold in their capacity as Union representatives.

[3]The 1994 CBA contained the 1998 date and the 1998 CBA contained the 2002 date.

3

Agreement shall cease on March 31, 1998 [2002]. If said Agreement is extended beyond March 31, 1998 [2002] it may be terminated on March 31 of any succeeding year in the same manner.

The termination clause in the Short Form provided that:

The above Employer agrees to be bound by all subsequent renewals, changes, extensions thereto and all subsequent agreements thereto, made by the original parties hereto, unless notice of termination is given to the Union by the undersigned not less than sixty (60) or more than ninety (90) days prior to the termination date.

Thus, all the termination clauses required notice to the Union, not the Funds.

**II.     Discussion**

While the parties dispute the date when Augers could properly terminate its agreement with the Union, there is no dispute that Augers had to notify the Union to effectuate the termination. Augers contends that its January 27, 2003, letter to Construction Industry Laborers Fund Administrator Taggart constituted notice to the Union of Augers' intention to terminate its agreement. For the reasons set forth below, the Court finds that it did not.

The plain language of the Short Form, which Augers is bound by, required the notice of termination to be sent to the "other party to the Agreement" which is the Union. Thus, unless Taggart or the Funds were agents of the Union authorized to receive notice of termination, Augers failed to give notice of termination to the Union by sending the letter to Taggart.

**A.     Are Trust Funds, as a Matter of Law, Agents of a Local Union?**

4

While Augers argues that the Funds are parties to the Collective Bargaining Agreement between Augers and the Union, there is no support in the record for this assertion. Augers President Patrick Griffith and Union President Carlton D. Young signed the Short Form Agreement, not the Funds or their administrators. Further, fringe benefit funds and their trustees are not, as a matter of law, agents of the Union for whom they collect payments. *See NLRB v. Amax Coal Co.*, 453 U.S. 322 (1981) (suggesting that pension fund trustees acting within their authority cannot as a matter of law be considered Union agents); *Griffith Co. v. NLRB*, 660 F.2d 406, 410 (9th Cir. 1981) (holding that neither the administrator of a pension fund nor his counsel was an agent of the Union); *Bennett v. Johnson*, 1993 U.S. Dist. LEXIS 8996, 7-8 (D. Ill. 1993) ("[T]he Union and the Pension Fund are separate legal entities. The Pension Fund is not inherently an agent for the Union.")

In *NLRB v. Construction & General Laborers' Union Local 1140*, the Eighth Circuit explained,

> Under the pertinent provisions of both the Labor Management Relations Act and the Employee Retirement Income Security Act of 1974, it is clear that trust funds for the benefit of employees are separate entities apart from labor organizations. A trustee of such a fund may also, however, be the agent of the union in other contexts.
>
> . . . .
>
> We are mindful of the fact that the conduct and responsibilities of trustees of a Section 302 trust are extensively regulated by the provisions of the Employee Retirement Income Security Act of 1974 (ERISA). 29 U.S.C. § 1001 et seq. We recognize also that if, as a general proposition, Section 302 trustees were viewed in the discharge of their trust duties as both fiduciaries and agents of the employer or employee organization who designated them,

5

>the trustees might in some circumstances be placed in a position of conflict of interest.

577 F.2d 16, 20 n.6 (8th Cir. 1978) (citations omitted). In other words, the Funds cannot automatically be agents of the Union for which they collect contributions from employers because such *de jure* agency would put the trustees in constant peril of violating their fiduciary duties to the beneficiaries of the Trusts. This is especially true since half of the trustees must be designated by the employers and half by the Union.

The Eighth Circuit left open the possibility, however, that some trustees or administrators may occasionally be *de facto* agents of the Union when they act in their role as Union representatives rather than in their role as trustees. Whether they do so in a given situation is always an issue of fact. *See NLRB v. Construction & General Laborers' Union*, 577 F.2d at 21 (holding that "in using his position as trustee to accomplish Union objectives, [trustee] was acting not as a trustee, but as a Union agent."). Thus, the Court must consider whether, under the facts presented by the parties, there is sufficient evidence for a reasonable factfinder to determine that any of the Funds' administrators or trustees could be considered agents of the Union for the purposes of receiving Augers' termination letter.

### B. Agency Through Apparent Authority

In its supplemental briefing, Augers suggests that apparent authority created the agency relationship between the Plaintiff Funds and the Union. Augers argues that to show apparent authority under Missouri law, one must prove

6

> (1) the [apparent] principal manifested his consent to the exercise of such authority or knowingly permitted the [apparent] agent to assume the exercise of such authority; (2) the person relying on this exercise of authority knew of the facts and, acting in good faith, had reason to believe, and actually believed, the agent possessed such authority; and (3) the person relying on the appearance of authority changed his position and will be injured or suffer loss if the transaction executed by the agent does not bind the principal.

*Bost v. Clark*, 116 S.W.3d 667, 677 (Mo. Ct. App. 2003). It is clear, however, that federal common law, rather than Missouri law, governs the scope of agency in ERISA cases. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (U.S. 1989) ("[C]ourts are to develop a federal common law of rights and obligations under ERISA-regulated plans."); *Stack v. Am. Med. Int'l*, 2005 U.S. Dist. LEXIS 4489, at *15 (D. Neb. 2005) ("[A]ctions under ERISA are governed by the federal common law of agency.").

Under federal common law, a party asserting apparent agency must prove "[1] a manifestation by a principal to a third party that [2] reasonably leads a third party to believe that another person is acting as the principal's agent." *Overnite Transp. Co. v. Highway, City & Air Freight Drivers Local Union No. 600*, 105 F.3d 1241, 1246 (8th Cir. 1997). Because Augers has not offered evidence from which a reasonable factfinder could conclude that the Union manifested to Augers a reasonable basis for believing that the Funds were acting as the its agent, summary judgment must be granted for the Funds.

In its supplemental briefing, Augers offers several letters it received from Plaintiff Funds. In a letter dated February 1, 1989, Fund Administrator Taggart advised Augers that he "received a copy of the collective bargaining agreement signed by [Augers] which obligates [Augers] to make contributions for fringe benefits to *this office. We* are pleased

7

to welcome your company as a contributing employer into the Fund." Def.'s Supplemental Sugg. in Supp., Ex O (alteration and emphasis added by Augers). The same letter further invites Augers "to contact us at any time if you have any questions concerning proper reporting, completion of forms, etc." *Id.* Augers also offers fifteen other letters from Taggert's office discussing reporting and contributions to Funds and audits by the Funds. *Id.* Exs. P, Q, S, T, V, Y, Z, AA, BB, CC, EE, FF, GG, JJ, KK. All of these letters were carbon copied to the Union. Augers also offers several letters from Augers to the Funds (Exs. U, W, DD, HH, , II) submitting its benefits reports or asking questions regarding the Funds audits of Augers' books. Finally, Augers offers three additional pieces of correspondence: a letter from Taggart to the Union, asking for a current copy of its CBA with Augers (Ex. R); a letter from Taggart to Funds' Counsel Newbold, suggesting that the Funds respond to Augers' attempted termination of the CBA (Ex. H); and a fax (on Union Local 663 letterhead) from Welfare Fund Trustee Jason Mendenhall to Augers, seeking Augers' signature on a short form agreement between the Union and Augers with regard to Cass County employees (Ex. X). In the fax, Augers is directed to return the Short Form to a designated fax number which was not the same fax number printed on the Union's letterhead.

With the possible exception of the faxed Short Form, none of the exhibits offered by Augers show any manifestation by the Union that the Funds were acting as its agents. The twenty or so letters sent between the Funds and Augers regarding reporting and contributions to the various funds are clearly sent on behalf of the Funds themselves, not on

8

behalf of the Union, and concern only the collections of benefits payments which is the Funds' primary obligation. The letter from Taggart to the Union asking for a current copy of the CBA is consistent with the Funds' duty to collect contributions under the existing CBA. If anything, this letter demonstrates that the two are separate entities. Further, that letter as well as the letter from Taggart to Newbold, suggesting that the Funds respond to Augers' attempted termination, are irrelevant to the issue of apparent authority as neither was copied to or received by Augers.

The only exhibit offered by Augers that even suggests a possible agency relationship is the fax to Augers from Welfare Fund Trustee Mendenhall which bore the Funds' fax number as the number to which Augers should return the signed Short Form. Further inspection of this fax, however, shows that it was sent on Union letterhead[4] as opposed to Funds letterhead and makes no reference to the Funds except to list their fax number (without designation as such) in the message line. Since half of the Funds' trustees are Union representatives and half are representatives of the employers, this fact in and of itself does nothing to further Augers' argument. That a given trustee, who also happened to work for the Union, would on one occasion use the Funds' fax line to conduct Union business does not establish a general agency relationship between the Funds and the Union.

---

[4]The letterhead itself indicates a Kansas City area fax number rather than the Jefferson City number used by the Funds. However, the message line gives what happens to be the Funds' fax number. This discrepancy suggests that Mendenhall was physically present at the Funds' office in Jefferson City rather than the Union's office in Kansas City at the time he was awaiting return of the fax. However, as half of the Funds' trustees are also Union representatives, it would not be unusual for such a trustee to make use of the fax machine at whichever office he happened to be at for the day. Except for the actual fax number, there is nothing anywhere in the fax to suggest that the letter was sent on behalf of, or even with the knowledge of, the Funds.

9

Moreover, the fax cover sheet was on Union letterhead and bore the Union's fax number. The only reference to the Funds anywhere was a handwritten fax number, pencilled in by Mendenhall, that did not identify itself as the Funds' fax line. Only by comparing that handwritten number to other correspondence from the Funds, could anyone at Augers have discerned that the pencilled-in fax was the same as the Funds' fax number. No reasonable factfinder could consider this innocuous coincidence to be a manifestation by the Union that the Funds served as its agent.

### C. Agency by Estoppel or Ratification

Even if the Funds did not have apparent authority to act as the Union's agent, Augers argues that the Union should be estopped from denying agency because it has somehow ratified the Funds' acceptance of the termination letter. Specifically, Augers argues that "[t]he actions and inaction by the Union after fully being apprised of Augers' notice of termination show equivocally [sic] that the Union ratified the actions of Mr. Taggart in accepting Augers' notice." Def.'s Supplemental Sugg. in Supp. of Summ. J., at 12. Yet, no evidence offered by Augers supports his claim that the Union was fully apprised of Augers' notice of termination.

First, Augers cites a February 19, 2003, letter from Taggart to Augers indicating that the Funds wanted to audit Augers' records. That letter makes no mention of the Funds' belief that Augers' termination letter was untimely or improper. *Id.* at Ex. EE. Nor did any of the subsequent correspondence from the Funds to Augers hint that the Funds did not consider the CBA terminated. *Id.* at Exs. FF, GG. But none of these letters indicates any

conduct or decision on the part of the Union itself. Augers also points to the March 17, 2003, letter from Taggart to Funds' counsel, Newbold, in which Taggart references a February 10, 2003, letter Newbold had written to trustees, Jeffrey Wilkenson and Mark Nidiffer, stating that Augers' termination letter was untimely. The implication is that since Wilkenson also works for the Union, then the Union must have had knowledge of the termination letter. But Wilkinson is also a trustee of the Funds, and the letter to him from Newbold was a letter sent to him in his capacity as a trustee, not a letter sent to the Union itself.

Essentially, Augers argues that because the Union did nothing in response to a letter that they didn't receive but could have known about, their inaction over the next two years, during which Augers quit making payments, somehow ratified Taggart's "acceptance" of the letter. It was not until February 2005 that both the Funds and the Union notified Augers (separately) that they believed the attempted termination had been untimely. Yet, Augers points to no conduct by the Union itself during those two years that could constitute ratification. Although Augers suggests that the Union knew of the termination and did nothing, there is no evidence before the Court that the Union did in fact know of the termination letter.

Only if one blurs the line between the Union and the Funds can there be any reasonable argument for ratification or agency by estoppel. But as the Court has already explained, the Union and the Funds that collect contributions on its behalf are separate legal entities. The Short Form agreements signed by Augers and the Union give rise to

11

obligations on both parties. They also create third party beneficiaries in the Funds. One party to a CBA cannot send a termination notice to a third party beneficiary and expect that notice to be binding on the other party to the CBA. Augers sent their notice of intent to withdraw from the CBA to the wrong party. That it took two years before the correct party learned of that mistake is not surprising given the history of insufficient contributions, audits, and litigation between Augers and the Funds: the Funds were just beginning to file suit against Augers for previous non-payment of contributions eight months after the attempted termination notice. The delay in pursuing the further lack of payment from April 2003 forward does not establish that the Union ratified the attempted termination.

### III.     Conclusion

There is simply not enough evidence in the record before the Court from which a reasonable factfinder could find that Taggart, or the other administrators of the Funds, were acting as agents of the Union when they received Augers' January 27, 2003, letter. Nor is there sufficient evidence to determine that the Union ratified that attempted termination. The Court, therefore, concludes that Augers did not give proper notice to the Union of its intent to terminate its agreement and, thus, remains bound by the CBA until proper notification is given. The Funds owe a fiduciary obligation to both the employer and employee organizations who have designated them to hold funds for workers. The Funds are not in a position to affirmatively assist either the employer or the Union to affect the interest of the other.

Accordingly, it is hereby

12

Case 2:05-cv-04058-NKL   Document 36   Filed 05/04/06   Page 12 of 13

ORDERED that Plaintiffs' Motion for Summary Judgment [Doc. # 25] is

GRANTED and Defendant's Motion for Summary Judgment [Doc. # 26] is DENIED.


    /s/ Nanette Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  May 4, 2006
Jefferson City, Missouri